Mr. Klingon, am I saying it right? Yes, Your Honor. Tell me if I'm saying it wrong. You paused. Well, it cuts down on the Star Trek joke.  Thank you, Your Honor. This case is an appeal from a scope ruling at the Department of Commerce on an anti-dumping case. The anti-dumping case involved tapered roller bearings, and these are similar to the ball bearings we all know. They work with heavier loads. Instead of a ball in the race, you'll have a tapered kind of oblong object that is more substantial and, therefore, handles a heavier load. Our position is that New Trends products – actually, let me backtrack for a moment. Procedurally, New Trend brought a – We know why you have to argue about New Trends products. Okay, very good. Thank you, Your Honor. Well, our position is that New Trends wheel hub assemblies are outside the scope, and what it really comes down to, I think, is a fairly straightforward proposition. The scope, if you condense it, the scope as was written by the Department of Commerce in the original order and as it's evolved is tapered roller bearings and then varieties of housed tapered roller bearings. Let me just make sure I understand. As it relates to the category that was handled under K-1, are you appealing as to that category or only as to the category with the ABS systems that was handled under K-2? We're appealing to everything. Okay. So, as it relates to certainly the K-2 analysis and the ABS system, your primary argument, as I understand it, is that, well, these have additional functionality. Somebody's buying essentially an electromechanical product instead of just a tapered roller bearing. Yes, Your Honor. But you concede the tapered roller bearing is within the electromechanical system that you're selling, right? Yes. All right. So, why does it matter that there are additional functions as well that you're selling? Well, if you look at the affidavit of Dr. Autar, he said that he's a mechanical engineering expert, and these are mechanical components, bearings. He said that a bearing is defined by its structure and function. It has the four parts, the cone, the cup, the rollers, and the race. And then it also has two functions. Commerce focused on one of them, but it actually has two functions. One function is to reduce friction. The other function is to reduce motion, so that if you have a wheel, for example, on an axle, you don't want that wheel going all over the place. The bearing takes the load of those up and down, sideways, and other directions and causes it to limit the turning. Are you saying that the tapered roller bearings in your wheel hub assemblies don't serve those functions? They do. Okay. They do. If you take your theory to its logical extreme, you could always prevent enforcement of these restrictions by simply building it into something else that has some additional function. Perhaps, Your Honor, but if you take what commerce did to its extreme, you would say that anything that has a bearing in it would be a bearing. Automobiles have cones, cups, rollers, and races in them, and bearings, both ball and tapered. But we don't call an automobile a bearing. It does other things. In this case… At what point do you draw the line? Are you saying that the line has to be drawn where the bearing is freestanding? I mean, there was discussion of wheel hub assemblies in the ITC report, right? Well, that's where I think the confusion began. If you look at the discussion of wheel hub… It was wheel hub units was the term that they used, and part of our problem is that these terms in the engineering world are interchangeable. A unit is anything that's been put together into a unitary whole. An assembly is anything that's been assembled. And if you create larger products, you will hear about subassemblies and multiple subassemblies in one assembly. That's what we have here. If you look at what the International Trade Commission said when it defined what a wheel hub unit is, it said that a wheel hub unit is a bearing packed into a flange with holes for mounting. That's a housed bearing. There's no question about that. And both of the experts in the case, Mr. Gromasiak and Mr. Autar, both said that. That's a housed bearing. In fact… Well, let me put that aside for a moment. So, you take the housed bearing on the one hand, then you take a totally separate cast, metal cast part on the other hand. That is what we call the inner flange. It fits inside the larger opening of the housed bearing. The bearing is inside that ring. You take that larger piece. It is the piece that does the torque transmission. It is the piece that the brake rotor is attached to. It is a piece that the wheel is attached to. It is the axle on this car. You take that and then you assemble it together with this housed bearing. Together, that makes the wheel hub assembly. And it's the piece that the housed bearing is attached to that provides all this other functionality. Right, and that's part of what Commerce looked at. I mean, that's one of the K2 factors is the physical characteristics. And we're supposed to give substantial deference to Commerce's determinations. I mean, I understand your argument that, well, then why aren't automobiles excluded because they have tapered roller bearings in them somewhere? But it's up to Commerce to draw the line as to whether or not this is really a meaningful difference and whether it's not. I mean, you go through all the factors, like it goes through the same advertising channels, the same distribution channels. You don't even dispute those. And as to the physical characteristics, you don't really define substantial differences in the physical characteristics. Well, the substantial difference is the additional part that's attached. If you take that part away, you'd still have everything that the wheel hub, that the housed bearing would do, except that the car won't stop or go. The car would be completely inoperable. So you want us to say that, A, Commerce was wrong, even though we're supposed to give them great deference. It's finding that that difference was substantial. And, B, that that answer alone overrides the other factors under K2 that Commerce also said in order to get you. Is that right? Yes. And actually, if you look closely what Commerce did under the K2 factors, they didn't really look at a bearing versus the product. What they looked at was the bearing compared to the ABS system. So, in other words, if you want to – let me just move ahead for a moment. Did you have a couple of different arguments? One was your unit is different because it has a spline aperture, it has some lugs, and it has an ABS unit. Right. Right? And then you have a second argument, right, which is you're saying that you have this wheel hub unit that – or what the scope would believe – the scope, the order would believe is a wheel hub unit combined in addition with some completely other piece called an inner flange. Right? Right. And now that you've married those two things together into this larger assembly, that larger assembly is not within the scope of the original order. Exactly. Is that your second argument? Yes, although both those arguments are very closely aligned and perhaps even a single argument. But did you make the second argument below? We did. I believe so, Your Honor. And we made it to Commerce. Do you have something in the record that shows that? There's two theories. One was lugs, spline aperture, and this ABS thing. And the other argument was, well, let's step back for a second. The part that's really within the scope is this one piece of my assembly, but my assembly is much larger than that. It's got this – it's got that plus this other thing called an inner flange. We – It's hard to look on the spot, and you're starting to crack into your rebuttal time. What do you think about taking a few minutes to find Judge Chen's answer, and if you can, tell him it on rebuttal? Very well, Your Honor. Thank you. We'll hear from Ms. McCarthy. You're going to use 11 minutes. May I please report? To address Judge Chen's question, Powertrain did raise the issue below, and it raised it before the agency, and it raised it before the trial court, and it was rejected every time. Although in its reply brief, it goes on at length to say that Commerce erred in using real hub assembly interchangeably with real hub unit. In fact, as Commerce found in its preliminary ruling on page 488 of the joint appendix, that Nutrend itself, the manufacturer of this product, used the terms interchangeably during the investigation, which is what – so when the ITC referred to real hub unit in its report, on which Commerce relied, that those terms had been used interchangeably by the very manufacturer of the merchandise at issue. So whatever argument there may have been about the distinction between a real hub assembly and a real hub unit, that was waived, and it was rejected not only by the Department of Commerce in its preliminary ruling on page 488 of the joint appendix, but also in footnote five of the trial court's opinion, which is at page five of the joint appendix, the trial court itself noted that the terms had been used interchangeably. Right, but you don't really mean it was waived. I don't think it was spoke. It was their own testimony contradicted it, and Commerce filed against them, and the trial court filed against them. Right. They didn't waive the argument. Well, not in a technical sense, but in the sense that this was ventilated, and Powertrain, first of all, doesn't really acknowledge that this issue, that it's already been commented upon, not only by the Department of Commerce, but by the trial court as well. But there wasn't any denial that Newtrend, in fact, used the terms interchangeably during the investigation, because Powertrain didn't even acknowledge that this has already been pointed out. Right. Let me take you to the logical extreme argument that your friend on the other side made, because it's one that popped into my head, too, when I was thinking through, and that is that if we – are you saying that anything that shows up with a tapered roller bearing in it falls within the bounds of the order? In other words, if an automobile were actually imported, would that fall within the bounds of the order? Or is there some place that the line gets drawn? And I'm not sure where the line gets drawn. Well, the line gets drawn, and of course, I've told this several times in DeFerco, in ArcelorMittal, more recently in Vidcon and now, the line gets drawn by the plain language of the scope of the orders. That's what draws the lines. And so there can be issues about what is actually the product against which the scope language is going to be applied. And that's part of what commerce – when commerce goes to a K2 analysis, as it did in the portion of the merchandise that had the ABS, anti-lock-breaking sensors, or ABS elements, I should say, they were determining, is this a product that's something other than what is really captured by the plain language of the scope of the order? So is it your position that head commerce really wanted to take the ultimate position, which is that anything that shows up with a tapered roller bearing, by definition, falls within the scope? They would have left it all under K1 and never had to do the K2 analysis. Right. They could have. I mean, commerce actually, I think, in a bit of conservatism, determined – because all of these, K1 and K2, and even the initial step, the plain language of the order, they should all lead to the same result. Doing a K2 analysis should not lead to a different analysis than the K1. It's mainly just a level of robustness in the analysis to make sure that this is really a product that is within the plain language of the scope of the order. But the plain language is – the order here was written very broadly. The petition was written extremely broadly, and the scope of the order was written broadly, and the ITC investigated a broad category of products. And the only thing that's really literally excluded are pillow boxes in terms of these tapered roller housings. And so, as Judge Carman noted below, in a furniture case called Legacy, in that case there were specific exclusions to the scope language, whereas there are none here that would take out a wheel hub assembly, a wheel hub unit, or a tapered roller housing with additional ABS elements. The reason why commerce, again, went to K2 here in conservatism is just to make sure we weren't talking about a different product. But if there are, of course, not only would the plain language of the order draw the line about what's within the scope of the order without, but also, again, if there's an argument that this is a different product, then we get into mixed media or something like that, which wasn't even raised. But just to be clear, so I understand your answer to Judge O'Malley's question, if what was being brought in was a car, it would be a car. It wouldn't be a tapered roller bearing under this order. Even if it happened to contain within it as one of the thousand parts a tapered roller bearing. Exactly. Again, there's this other line of cases which are not at issue here, so I'm hesitant to discuss them, but the mixed media cases, that's determining what is the product that we're actually looking at. Are we looking at a tapered roller bearing? Are we looking at a car? And that's what the test is designed to apply. That's not really an issue here. The issue here, there's no question here we're talking about tapered roller housings. They're saying it's additional functionality enough to take it outside the scope of the order. And so with all respect to Powertrain's expert, by doing a rather philosophical analysis of functionality, that's not really relevant because what's relevant is the physical characteristics that are described by this. I thought intended use and everything, you're supposed to look at it and understand. So I guess your last statement went a little further than I'm comfortable with. I went a little bit too far. I didn't want to say the functionality wasn't relevant. Obviously it is. It's just that the K2 analysis is meant to assure that we're talking about something that's within the ballpark and that's not something far afield from the scope of the order. But the physical characteristics are really, there's no concession. Powertrain concedes that the physical characteristics are captured by the language of the scope of the order. They're not pillow boxes, which is the only exclusion that would be applicable here. And so I guess if there are any other further questions, I could. Mr. Fennell, you have one minute. Thank you, Your Honors. May it please the Court. I'm here representing the Timken Company. The Timken Company was the original petitioner. They identified in their petition that led to the order that we're addressing here, the scope of. They indicated they made 150 different types of tapered roller bearings that are sold in 26,000 bearing combinations. Very broad category. Commerce Department looked at this category and developed as per their regulations, a general description, a generic description. That of the subject merchandise. That description included tapered roller housings incorporating tapered rollers with or without spindles. And I think that part of it goes to Judge Chen's question about assembly. And it is not correct to say that the only merchandise in scope is that outer flange with the TRV and something is inserted, the inner flange that you attach the wheel to. The scope description specifically says with spindles. Which means that you're talking about a wheel. Yes. Not a wheel. The wheel is attached to it. A wheel hub that the wheel can be attached to. On the first, as Judge Chen characterized it, on the first argument of the different features, we put into the record a diagram that was included, the A668. This was included, the picture without the labeling was included in attachment three to the petition. It was described as a wheel hub unit. And almost all the features identified by New Trend in their filing are there. There's no ABS sensor there. And that certainly is one of the reasons why Commerce went and did a K2 analysis to determine that. Is this blind aperture in A668? Sorry? Is this blind aperture there? Yes, correct. The part in the middle, spline engagement of the CV joint. It's basically things that intermesh and allow you to, one thing to drive another. And the wheel mounting studs, those are the lugs? Correct. So all these features were there in the petition, in one of the objects identified. Commerce reasonably described them as tapered roller housing with spindles in this case, and some without. It could be sold without the spindle as well. So Commerce made a reasonable description. When they did, when they embarked on the scope determination, they looked at what New Trend said about its devices, about its products, and found that they fell within the scope language. They said these wheel hub units are essentially tapered roller housings with splines, and then went on and used the K2 analysis to determine whether ABS sensors were a feature that would take the product outside the scope. They had already decided that the features mentioned, the splining and the lugs and so on, were engineering or design features of tapered roller bearings. Any questions? Okay. Thank you. Thank you. Mr. Clayton, you have your less than five minutes left for rebuttal. Thank you, Your Honor. What the government identified as a problem is, I think, the key problem to this case, which is the use of the language, the interchangeability of wheel hub unit and wheel hub assembly. What the terms really mean is just a unitized component or an assembly that's to be used with a wheel hub. To answer Judge Chen's question in our reply brief, we went into the construction of the product at some length. I'm referring now to page four of the reply brief. But it's important to note that when you go to the ITC's use of the term, which is where this whole issue got started, the ITC said that a wheel hub unit is a bearing that's housed in a flange, one flange, with mounting holes. If you go to… It also talked about next generation products, right? It said it in passing. It didn't describe them. It said that they would have different… It would have described them a little bit. It said inner and outer flanges, right? It would have inner and outer flanges. It would have other components. It would have additional functionality as well. Yes, but see, in describing that, it wasn't describing the bearing. It was describing an assembly. And the language doesn't include assemblies. It includes bearings, in-house bearings. So you have this kind of incremental and there's a danger of bootstrapping. If I might, just for a moment. In the record, in the catalog that Timken included with its petition, and this is at A643, there's a series of illustrations and there's text beneath them. The text says, our innovative Timken Unipack bearing is so totally self-contained, preset, pre-sealed, pre-greased to make installation extra fast, easy, and accurate. That's a bearing that's been pre-assembled. The cone, the bearing, the rollers, those elements have all been assembled. They've been packed with lubricant and they're sealed. And that can be used in a wheel hub. That would be called a wheel hub unit or a wheel hub assembly, and it has been. The next paragraph says, our more innovative Unipack Plus bearing has all of the above, plus part of the outside race is an integral mounting flange. So production will have just one piece to bolt on. Next increment, that's the mounting flange. That's the house bearing. The next paragraph says, our complete wheel package with bearing, spindle, and housing is pre-sealed, et cetera. So even they identify a bearing, a house bearing, and then something they call a complete wheel package. Another term that we can put alongside wheel hub assembly and wheel hub unit. The problem is that unless you identify the terms at the outset with the definitions are given at that point, you end up with this burgeoning definition that can be anything that's used in association with a wheel hub. And so what you have, if you look closely at what Commerce did, they started with bearings and house bearings. Then they said, well, ITC said a house bearing is a wheel hub unit. Then wheel hub unit took over. Now wheel hub unit is used interchangeably with wheel hub assembly. And now we're off to the races. What Dr. Autar said in his affidavit, there's nothing to refute it. Are you challenging the validity of the order? You're saying that the order was somehow invalid for being too broad? No, I'm saying the interpretation of the language. In other words, the order says bearings, but we end up through a series of steps with the order of wheel hub units. No, it doesn't. It says the scope I'm talking about. I'm sorry. The scope says bearings and house bearings. It doesn't mention wheel hub units or assemblies in the scope. And then what ITC said is a wheel hub unit is a house bearing. It's a bearing packed into a single flange with mounting holes. No mention of lugs, no mention of the other elements. That's where the expansion comes in. So then if you adopt wheel hub unit as your term, say that's within the scope because that's a bearing. Then you say, well, wheel hub assembly is used equivalently with wheel hub unit interchangeably. Then anything that anyone describes by those two terms comes in. They say, well, that's within the scope because a wheel hub unit and assembly are perforced. Do you have a closing thought because we're out of time? Thank you, Your Honor. Thank you, both counsel. The case is taken under submission. Our next case today, 2013-7098, Benner v. Shinseki.